Our next case for argument is 23-1605, Achieve3000, Inc. v. Beable Education, Inc. I should have said this at the outset, but while you guys are getting ready and taking a minute, we are very privileged to have Judge Mazant here sitting with us. I was supposed to say it at the start, I just realized I forgot. He's a district court judge from the Eastern District of Texas, and he agreed to come sit with us today. So it's our great privilege to have him. Thank you. Mr. Isaacson, please proceed. May it please the Court, Robert Isaacson for Allen Achieve3000, Inc. We refer to it as A3K, also the patent owner. We ask the Court to reverse the Board's decision of obviousness because there are clear gaps between what the Fire Act discloses and what the claim limitations at issue require. Can I ask one preliminary question before you get into more here? Do you agree that the Board's finding of these limitations at issue on Claims 1 and 8 rise and fall together?  Go ahead, continue. The Board made findings of what the prior art does not disclose, and it erred in relying on the appellee's Beable Education, Inc.'s expert, Christopher Vento, to fill those gaps. Mr. Vento's opinions are, in the end, conclusory, ipsy-dixit, inconsistent, and hindsight reconstructions of the art. As our view, TQ Delta and the Xerox cases cited in our brief establish that they're not substantial evidence. The claim limitations at issue are quite wordy. In essence, they provide differentiated content so that users, in this case students in the same class, can be taught the same lesson using a version of the content that's specifically aligned to their reading abilities, those different reading abilities. We refer to this as the plurality of aligned versions in the generic sense. Do you want to take one of the limitations at issue here and tell me why you believe there isn't substantial evidence for it? Sure. So, for example, in limitation 1.5, this notion of generating a plurality of aligned versions at different user reading difficulty levels in accordance with the unique standard code is a mouthful, but when we refer to that as a plurality of aligned versions, at trial, the board found, sorry, at trial, the ABLE conceded that the two references they rely on, Cappellucci and Cupp, do not disclose this plurality of aligned versions. The board made that finding at Appendix 39. Under the Strathclyde case, that's enough to determine that the obviousness decision was not supported by the prior art because the prior art doesn't disclose the inventive feature, which is a plurality of aligned versions. Going further, second reason, at trial, the ABLE admitted that obviousness was based on first combining Cappellucci and Cupp references, and then second, further modifying that combination. And the board erred in adopting Mr. Vento's testimony to bridge that gap between what Cappellucci and Cupp was admitted not to disclose and what the claims require. Again, this plurality of aligned versions, the inventive feature. Mr. Vento's opinions on bridging the gap are ipsy-dixit and taken out of context, reconstruction of the prior art. He offered, well, for example, in Paragraph 176 at Appendix 702, Mr. Vento gives an opinion that the Cupp reference teaches to determine a reading level. We agree with that. But he went on with absolutely no basis to say that Cupp also teaches to generate a news article that could be written in content appropriate for a second grader, fourth grader, or sixth grader reading level. We submit there's no basis for him to make that conclusion except hindsight. Because if you look at the challenge patent, the 993 patent, at Column 7, Lines 32 to 36 at Appendix 115, it describes just that. Going to a news article, taking it, and rewriting it to align it for different reading level abilities of the people who are going to get it. He then goes on to talk a reliance on the Cappellucci 934 patent, which is one of the two Cappellucci patents, Paragraphs 90 and 93. He cites a number of paragraphs which basically talk about customizing. And Mr. Vento gives the opinion that customizing is giving information at different reading levels. But he's taken it out of context. When you read through the Cappellucci paragraphs he cites, what it's talking about is customizing in the context of the Cappellucci system which gets the user profile, which has the reading ability in it. Can you give us a specific appendix page? It's paragraph 176, 182, 245, and 246. Can you give me the appendix page? Appendix 702, 705, 738, and 739. And that's Mr. Vento's testimony. And in each of those different paragraphs he cites to Paragraph 90 and talks about customizing, I believe. At least customizing. Why don't you just go to page 830 of the reference, which is where Paragraph 90 is, and tell us why that paragraph is substantial evidence for the Board's finding about this customizing concept. Because I'm looking at it and it talks about personalizing. This is Paragraph 90 of the reference. Oh, sorry. Thank you, Your Honor. It's page 830 of the appendix. This is what the Board cites. This is what Mr. Vento, I think, cited as well. It's the actual reference. Yes. So Paragraph 90 talks in the second line, customize, localize, and personalize the information provided to the user. When you read the context of, when you read the reference as a whole, in context, customizing there is talking about taking the user's profile, going to the database, identifying content that's appropriate for that user, selecting that content, and then delivering it to the  It makes no reference in the use of customizing to modifying the text to create a plurality of aligned versions. I'm sorry? I don't know if I'm looking at the correct portion, but I believe if you look at the end on 830, the last, I want to say last two sentences or so, wouldn't that actually disclose what's set forth in Claim Limitation 1.5? No, that's actually the reverse, Your Honor, because what that says is if you have content you deliver to a second and third grader, you give them the same informational content, that's the second to last line of that paragraph. That means you do not change the text. What that paragraph talks about changing is the presentation, the format, the color, the font. That's not what we're talking about in Claim 1.5 with respect to modifying the text, the informational content. As Claim 1.5 provides, you have to modify vocabulary and sentence length. This reference discloses nothing about that. In fairness, I'm not sure that that's the correct reading because earlier in the paragraph, right, about the middle of that paragraph, it says this information can be used to select information that is presented to a user and how that information is presented to a user. For example, so I think what they're saying here is that there's two different ways that the content can be varied. One is its format, like you're suggesting, and the other is its substance. Your Honor, I respectfully submit there's nothing in the Cappellucci references that talks about changing the substance by modifying the sentence length or vocabulary. It talks about presentation, which is the format, the way it looks, the way it appears, so that certain texts might be highlighted, other texts won't be. Okay, so that sentence says this information can be used to select information that is presented and how that information is presented. That's right. So the formatting that you're talking about is how that information is presented, but selecting which information is presented seems to be a statement that they're looking at choosing which pieces of information you're going to present. That's exactly right, Your Honor, but that's the customizing aspect I just mentioned. What Cappellucci teaches about customizing, that's taking the user profile, then going to the database, see what's in there, what content is available, and deliver it. It's not talking about changing the content to create a plurality of aligned versions so that the students in different grades have different content, whether or not the appearance is different does not be an issue. They have different content that's appropriate for their specific reading abilities. So the second, third graders, and fourth graders would have different reading levels. But if you go on and just follow up on Chief Judge Moore's question, isn't there statements about, for example, the achievement levels in the student profile can be used to filter questions in a practice assessment test delivered to a student, and then read on how you can filter out easier questions from a test, from a test presented to a student who has a higher level achievement. I don't want to do a reading exercise with you, but it seems like there's something here in paragraph 90. What they're talking about is going to the database and finding what's already there. Cappellucci correlates information into a database and uses the user profile so that you can select. The context is that if you have information that's appropriate and not appropriate, it customizes it by finding what the user wants and then going and getting what the user wants. It doesn't say, get me an article and change it so that I can read it in my appropriate reading level ability. That's what the invention was. That's what our clients came up with. And that's what enabled them to form a company and sell it, and then jump ship, form another company, and challenge the patent. So here we're really looking at the combination of COP and Cappellucci, right? Yes. So do you have something you want to address with respect to COP? COP... Well, because COP seems to supply the element that you think is missing from Cappellucci. I could be wrong, but I think on page 841, which is where the COP reference has paragraph 37, that seems to be the one everybody's focused on. It doesn't just talk about a sentence being deleted and you're telling me you want me to read Cappelletti or whatever it is to only be about deletions. This doesn't even just say if a sentence is deleted. It also says you can add a replacement sentence in an attempt to maintain the flow of the story. So to the extent that you thought that maybe Cappellucci didn't disclose modification or customization, the combination of Cappellucci and COP seems to... I don't know. Substantial evidence is kind of a tough burden. How do I not read that as substantial evidence? So that's a different aspect of the claim. To go back to just the plurality of aligned versions, COP does not teach to make a plurality of aligned versions. What you're talking about, Your Honor, is the maintaining step. And that's a separate part of the claim, which involves transforming content. It's all 1.5, right? It's all 1.5, Your Honor, but there are different aspects of 1.5. And our first position is that they don't even teach the plurality of aligned versions. So you don't even get to the maintaining step. If you believe they got the plurality of versions, which is not shown because COP only writes one. It says, give me a draft. I can modify it to whatever targeted reading level you want. That's all it does. It doesn't say, give me a draft. I can make multiple copies of the same thing. In fact, if you read through COP, it doesn't even say anything about what you do with the original content. It's put in a processor and the user can edit it. You can add words. You can subtract words. You can make things larger. Why don't you get to that second argument? Because the board found that Cappellucci could be read to provide these aligned plurality formats. And I mean, I see your point. And had the board ruled in favor of you and made a fact finding contrary to the one they made, I probably would have for sure affirmed it. But the one they made, I think, can also be affirmed based on Cappellucci. So why don't you move on to that modified one? On to the maintaining. What the board found was that Cappellucci didn't transform content, so it couldn't maintain the content. Cup. Cup. Cup, it was silent. The board found that Cup was silent on whether or not to maintain it. What? What about paper 37? Appendix 38. I'm sorry, your appendix 38? Yes. You're saying what? It said, we do not find Cup's silence on the issue to support our assertion. So they found that Cup was silent on the issue. They disagreed with our argument, but they found it was silent. That's my basis. It's about the fourth or fifth line down. On changed subject matter? Yes. Is that what you're saying? Yes. Thank you, Sarah. So Cup is not tethered. Cup makes changes, but it's not tethered to the original content. I'm going on to appendix page 39, right? It says here, although we agree with Padnor that neither Cup nor Cappellucci alone teaches the entirety of the limitation issue in element 1.5, we disagree that the petitioner's discussion of the proposed combination fails to address this recitation. And our position is that they relied on Mr. Vento's testimony, which is not supported by substantial evidence. It's Ibsi-Dixon. It's conclusory. It mimics the petition. It doesn't really provide any evidence where he shows that Cup actually does not or naturally will not modify the content. Let me give you an example. But we disagree with that. I'm sorry? If we disagree with your reading of Vento, then we're left with, they made this credibility finding and we're stuck with it, aren't we? Well, I think there's a question of whether there's, well, in that respect, yes, Your Honor. But I think there's a real question of whether Mr. Vento has any evidence to support his conclusions. If you consider the example they talk about, he talks about a terrorist, an article about terrorism. And if you delete a sentence, it won't change it about terrorism. Well, what Cup teaches is that if you want to increase the reading level, you change the syllables of a key word. So you take the word terrorist and change it to revolutionary. And all of a sudden, you've changed the context, meaning, and subject matter of an article about a terrorist to a revolutionary. And it's consistent with Cup's teaching, which is that you use more syllables, three syllables on terrorist, five on revolutionary, a higher reading level. So to say that it doesn't change content is just not supportable. Okay, well, you've used up all your time and your rebuttal time. I'll restore some rebuttal time. Let's hear from Mr. Bemben. Thank you, Your Honor. And may it please the Court, my name is Richard Bemben, and I'm here on behalf of D'Abel. The Court should, from the Board's decision, the Board's decision is, especially with respect to the issues on appeal, it's well-reasoned and it's thorough. All of the issues that are raised are based on factual findings, and those findings are supported. What is the Board's factual finding on the maintaining the flow of the story, maintaining the, whatever that language is, the 1.5 at the end of that? So I disagree with the way A3K is characterizing the Board's decision. It's maintaining subject matter of the first unmodified content.  So the Court doesn't want to. Honestly, I thought it was in paragraph 37 where they say, in an attempt to maintain the flow of the story, but opposing counsel just showed me that the Board did not make that fact finding. In fact, the Board's talked about Cupp's silence, and I can only affirm on things that the Board did, right? So even if I think it's right there in paragraph 37, clear as day, I don't know what to do because I don't get to do that. So I think it is clear as day in appendix 37, Your Honor. It doesn't help me if the Board didn't say anything about it. So the Board did, and let me just explain a little bit about this limitation. So what the Board found is that Cupp has two different editing routines, one for increasing the reading. Show me in the Board opinion exactly where the Board found paragraph 37 of Cupp discloses that last part of element 1.5, which is maintaining subject matter refers to unmodified content. So what the Board said in its decision. Where? On page 36 of its decision. It starts by, so as I was mentioning, Cupp has two editing routines. There's an editing routine for increasing the reading difficulty level. I'm on page 36. Where in the Board's opinion does it say that paragraph 37 satisfies that limitation? It doesn't say that paragraph 37, as far as I recall, it doesn't say that deleting the delete sentence in paragraph 37 satisfies that limitation. What it says, what the Board says in the Board's finding, or the Board's statement with respect to silence is being mischaracterized, I believe. The Board was addressing a very specific argument. It wasn't addressing limitation 1.5 as a whole. Below what A3K had argued was that the editing routine. Tell me whether or not this helps you. On appendix page 36, I see this portion where it says, Cupp discloses deleting entire sentences to reduce the reading level. And then there's a least in parentheses of paragraph 37. Am I misunderstanding what is being referred to here? What the Board is saying, it's saying that in support, Patent Owner highlights that they're describing the Patent Owner's statement. And the statement in Cupp about deleting a sentence is found in paragraph 37. And so this first large paragraph in page 36 of the Board's decision, I believe, is describing the Patent Owner's argument below. And then they go on to say that this argument does not identify a deficiency in petitioner's position. And the reason is, one of the primary reasons is that there are two editing routines. And there's an editing routine for increasing and decreasing. The decreasing editing routine is the one that they focused on below, and that has to delete the sentence. What the Board found is that the scope of limitation 1.5 is broad enough to encompass increasing reading difficulty level or decreasing. Below, the only thing that A3K argued was the decreasing. But the Board went on to find in paragraph, I'm sorry, in page 36 of the decision, that the increasing editing routine satisfies limitation 1.5. What I'm asking about, and this is where I'm trying to drill down, is this maintaining subject matter part. Because that is one of their arguments on appeal. Where did the Board find that these references disclose maintaining subject matter of the first unmodified content? My question isn't about raising or lowering the level. That's not relevant to me. So in the report, so page 37 of the decision, appendix 37, the Board says, relied upon figure 3 of CUP as a flowchart illustrating an exemplary method for editing a written work to decrease reading ability level. Whereas figure 2, also relied on by petitioner as to element 1.5, is a flowchart illustrating an exemplary method for editing a written work to increase its reading difficulty level. The Board went on to find that the method shown in figure 2 maintains the subject matter. Where? Where did they find that? They say, even assuming that deleting a sentence would fail to maintain the subject matter in declarative line versions, that step need not be included in all possible instances of the proposed combination. They're agreeing with us that the method for increasing the reading difficulty level would maintain subject matter. Why? Why would increasing the reading level maintain the subject matter? So the CUP, they looked at CUP figure 2, which is at appendix 835, and the types of... Go slower, please. Sorry, my apologies. Where? Figure 2, appendix 835. And what CUP demonstrates or what CUP teaches is an editing routine that will join sentences in order to create larger sentences or will replace certain words with synonyms in order to make the reading difficulty level more challenging. But it doesn't change... Those types of edits are not the type that would change the subject matter of that article. And in fact... How do you know? How do you know? Who says? So Mr. Vento said in paragraph 255 of his declaration, which is at appendix... Okay, look, respectfully, this is not rocket science. I mean, deleting sentences or adding sentences could absolutely change content, right? I mean, it could not. It could change content, but that's not the issue here, Your Honor. The issue here is... I'm trying to maybe make this a little bit of hook-down phonics here or something, but could you look at footnote 10? Sure. So the maintaining subject matter, what the board was saying, was that the patent describes maintaining subject matter as maintaining the same content topics, main ideas, and core elements. That's the example that they give. But even beyond that, if we look at the way... So the 993 patent describes subject matter in a very broad sense in the terms of just essentially a topic. And I can point you to appendix 116. This is the 993 patent itself, which explains that subject matter, an example of subject matter, is terrorism. It actually describes in column 10, line 50, it says, Thus, each student receives an article covering the same terrorism subject matter. It describes subject matter very broadly. And so even if Cupp's deleting, if you have to reach the issue of whether Cupp's editing routine for deleting one sentence, deleting a sentence in an article about terrorism doesn't change the subject matter. It's still about terrorism. And as I was saying, Mr. Vento's testimony in paragraph 255 supports the board's decision, where he explains, and this is at appendix 744. He says, A person of ordinary skill in the art would have understood or been obvious that Cupp's methods maintaining the subject matter of the first unmodified content. Cupp's methods replace words with synonyms and combine or separate sentences. A person of ordinary skill in the art would have understood that such edits modify the content of a written text without changing the subject matter. Okay, so the replacing words with synonyms is your main argument for how it addressed on the maintaining the subject matter? The entire method in the increasing and decreasing is that the types of edits that they're making, breaking up sentences or joining sentences or replacing words with synonyms, it doesn't change the subject matter. And just kind of taking a step back to the point that Did you not argue to the board that the maintaining of the flow of the story thing carried water? I mean, did you not make that argument? That it didn't carry water, I'm not sure I understand your comment. That it would satisfy the limitation. I mean, that to me, when I read paragraph 37 of Cupp, I'm like, Oh, there's the limitation. Maintaining the flow of the story, that is the same thing as maintaining the subject matter. My apologies, Your Honor, yes. But, you know, unfortunately the board didn't make that finding. It never cited to paragraph 37 for that fact finding. And that's driving me crazy because it's right there. And paragraph 37 was cited otherwise, but not to this limitation. It's very strange. Did you not make that argument? I'm wondering if that argument was at least made in your petition somewhere. I don't recall if it was made in the petition, Your Honor. But I think even beyond that paragraph, which supports the board's fact finding, the board was on solid ground when it found that the types of edits that are in the editing routines of merely combining or breaking up sentences and replacing words with synonyms would maintain the subject matter, especially when the subject matter is defined very broadly in the context of the 993 patent. And I don't, again, I don't agree with the way that my friend is characterizing the board's discussion with silence. The board was addressing a very specific issue, whether deleting a sentence would change the subject matter. And what they said was that Cupp doesn't say one way or the other. And that was it. But then they went on to find that the types of edits and the things that Cupp is doing would maintain the subject matter, that that would have been obvious to a person of ordinary skill in the art. Unless there are any questions on that, I'll turn to paragraph 90 of Cappellucci, which got some discussion. And this is with respect to limitation 1.5 again, generating a plurality of aligned versions. Now, I agree wholeheartedly with your honors that paragraph 90 is not just about a modifying format. What this is teaching is that this system can deliver customized content to students based on information that's in student profiles, which includes information about It doesn't matter whether it's teaching it. It could teach that, and the board found it didn't. This is substantial evidence. Well, the board found that it supports the combination. That was being helpful.  Okay. I didn't say I forgot that.   Okay. And I agree with you, but I'm just saying that the board relied on this paragraph as well as many paragraphs from Mr. Vento's declaration that explained that there was a well-known problem in academia, that there was a mixed ability in classrooms, particularly with respect to You should wrap yourself in the substantial evidence flag now and then. Yes. Substantial evidence. There's many paragraphs, including a paragraph in Cappellucci that talks about delivering customized news content. My friend said that there was no support for that. Customized news content is in paragraph 93 of Cappellucci 934. Unless there are any questions on that point. I assume that you also agree with the statement that claims the claim limitations that are issued here for claims 1 and 8 rise and fall together. I do. Thank you. I do. Unless there are any questions for me, I'll see the rest of you then. Thank you very much. Mr. Isakson, we'll give you two minutes of rebuttal time. Thank you, Your Honor. To go back to paragraph 93 and 94 of Cappellucci 349, those are all talking about the customizing nature of selecting information. If you look at paragraph 93, about the middle, Judge Cunningham, you asked about this earlier, it says, the system, for example, search many news information sources for news as a function of preferences, attributes, and other found in user's profile, such as sports and local news. What page are you on? I apologize, I missed the page. This is appendix, I think, hold on, 8... 831. 831, yes, thank you, Your Honor. So it says, and this is the important part, locate the information... Are you in paragraph 93 or 94? 93. This is about line, well, it's the middle. Line starting news, locate the information, assemble and format the information into an undefined or user-defined form and present it to the user. That's the format. That's the appearance. That's not changing content. That's not changing sentences. It's not changing words. But that's... Paragraph 93 begins with, for example, the system can do this. That doesn't mean what's in paragraph 90 isn't going beyond that. This is just an example. That's exactly right, Your Honor, but it is not going beyond it. It is just an example of appearance, of a format change. Yes, and 93 maybe is that, but why isn't 90 arguably, as the board found, disclosing more than just an appearance change? Because there's nothing in 90 that describes changing the text, changing the words. Well, so we disagree, because that sentence, this information can be selected, used to select information, that's the words, that's the content, or how that information is presented, and that's the format. That's correct, Your Honor, but that's not changing the text. It's not changing sentences. And that's substantial evidence for it. You have gone over your time. Thank you, Your Honor. Thank you. Thank both counsel. This case is taken under submission.